# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| PAM MILETELLO | CIVIL ACTION NO. 16-1623 |
| VERSUS | JUDGE ROBERT G. JAMES |
| R M R MECHANICAL, INC., ET AL. | MAG. JUDGE KAREN L. HAYES |

## RULING

Before the Court is a Rule 12(c) Motion for Judgment on the Pleadings [Doc. No. 32] filed by Plaintiff Pam Miletello ("Pam"). For the following reasons, Pam's motion is DENIED.

### I. FACTS AND PROCEDURAL HISTORY

Gerald Miletello ("Gerald") was a principal of Defendant RMR Mechanical, Inc. ("RMR") and participant in RMR's 401(k) Plan ("Plan"). [Doc. No. 1].

Defendant Sandra Bellgard Miletello ("Sandra") was married to Gerald until their divorce on January 21, 2014. *Id.* On May 23, 2014, Gerald and Pam married. [Doc. No. 38]. Gerald and Sandra entered into a community property settlement agreement, which Gerald signed on April 20, 2015, and Sandra signed on May 4, 2015. Sandra contends that the property settlement agreement contained a provision that contemplated Gerald would "rollover $500,000.00 from his Fidelity 401K Plan, RMR Mechanical, Inc. into [Sandra]'s Merrill Lynch IRA."[Doc. No. 36-2, p. 1].

On May 22, 2015, the community property settlement agreement was filed into the conveyance records of Ouachita Parish. [Doc. No. 36-2, p. 1]. On October 26, 2015, Gerald died in a plane crash. [Doc. No. 14-2]. On October 27, 2015, a Judgment incorporating the community property settlement agreement was entered. [Doc. No. 36-1, p. 2].

On November 22, 2016, Pam Miletello filed the instant lawsuit pursuant to the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, claiming that she is the surviving spouse of Gerald and the beneficiary of the interest in his Plan. [Doc. No. 1]. As Gerald's former employer, RMR is the plan administrator. *Id.* at 1.

On January 18, 2017, a Qualified Domestic Relations Order ["QDRO"] was filed. [Doc. No. 14-3]. Sandra claims that Gerald's attorney engaged in dilatory acts that prevented her from receiving the QDRO prior to Gerald's death. [Doc. No. 36-1, p. 3].

On April 27, 2017, Pam filed the instant Motion for Judgment on the Pleadings [Doc. No. 32] requesting that the Court, pursuant to Federal Rule of Civil Procedure Rule 12(c), recognize Pam's right to the funds in Gerald's Plan. Pam argues that she was vested with the rights to the Plan immediately upon the death of Gerald. *Id.* at 3.

On May 17, 2017, Sandra filed an Opposition [Doc. No. 36], and on May 31, 2017, Pam filed a Reply [Doc. No. 37].

On May 31, 2017, Pam filed a Request for Judicial Notice [Doc. No. 38], which contained a marriage license between Pam and Gerald.

## II. LAW AND ANALYSIS

### A. Standard of Review

The standard for deciding a Rule 12(c) motion is the same as a Rule 12(b)(6) motion to dismiss. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). In determining whether dismissal is appropriate, the court must decide whether the facts alleged in the pleadings, if true, would entitle the plaintiff to a legal remedy. *Ramming v. U.S.*, 281 F.3d 158, 162 (5th Cir. 2001); *Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994). When considering a Rule 12(c) motion,

2

the Court must construe the allegations in the complaint in the light most favorable to the non-moving party, but conclusory allegations and unwarranted deductions of fact are not accepted as true. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). Judgment on the pleadings is appropriate only if there are no disputed issues of material fact and only questions of law remain. *Voest–Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 891 (5th Cir. 1998).

B. **Analysis**

Pam moves for judgment on the pleadings "recognizing her right to the funds in her late husband's 401(k) account." [Doc. No. 32, p. 1]. Pam argues that she was vested with the rights to the Plan immediately upon the death of Gerald Miletello. *Id.* at 3. The pleadings do not contain a copy of the plan or the distribution of benefits. However, Pam contends that "an administrator must act in accordance with the documents and instruments governing the plan insofar as they accord with the statute, § 1104(a)(1)(D)."[1] *US Airways, Inc. v. McCutchen*, 133 S.Ct. 1537, 1548 (2013); *id.* Pam argues that even if the Plan does not expressly provide for payment of the funds to her, the statute still requires such a payment. [Doc. No. 32-1, p. 4].

1. **ERISA Statutory Requirements**

ERISA is a federal regulatory scheme that governs employee benefit plans; all benefit plans must conform with ERISA reporting, disclosure, and fiduciary requirements. *Boggs v. Boggs*, 520 U.S. 833, 841 (1997). Pension plans must also comply with participation, vesting, and funding

---

[1] 29 U.S.C.A. § 1104(a)(1)(D) states, in pertinent part that, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter."

requirements. *Id.* The Retirement Equity Act of 1984 ("REA"), Pub. L. 98-397, 98 Stat. 1426, amended ERISA in two important ways with respect to surviving spouses. REA first sought to "ensure a stream of income" to surviving spouses by requiring pension plans to provide automatic surviving spouse benefits. *Boggs*, 520 U.S. at 843. Section 1055, as amended by REA, provides that if a vested participant dies before the annuity start date, leaving a surviving spouse to whom he has been married for at least one year, "a qualified preretirement survivor annuity shall be provided to the surviving spouse." 29 U.S.C. § 1055(a)(2).

Generally, ERISA precludes the assignment or alienation of benefits under covered plans, 29 U.S.C. § 1056(d)(1), and preempts state laws that "relate to" employee benefits plans, *id.* § 1144(a). However, ERISA's anti-assignment and -alienation provisions do not apply to, and ERISA does not preempt, "[QDROs]." *Id.* §§ 1056(d)(3)(A), 1144(b)(7); *see also Boggs*, 520 U.S. at 846–47. The QDRO is a subset of "domestic relations orders" that recognizes the right of an alternate payee to "receive all or a portion of the benefits payable with respect to a participant under the plan." 29 U.S.C. § 1056(d)(3)(B)(i)(I). If a domestic relations order qualifies as a QDRO, the designated alternate payee–"any spouse, former spouse, child, or other dependent of a participant"–shall be considered "a beneficiary under the plan." *Id.* at §§ 1056(d)(3)(J)-(K). "Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order." *Id.* at § 1056(d)(3)(A).

In addition, the statute specifically contemplates the assignment of surviving spouse rights to a "former spouse" in a QDRO:

> To the extent provided in any qualified domestic relations order--
>
> > (i) the former spouse of a participant shall be treated as a surviving spouse of

4

> such participant for purposes of section 1055 of this title (and any spouse of the participant shall not be treated as a spouse of the participant for such purposes)

*Id.* at § 1056(d)(3)(F)(I). Together, the surviving spouse and QDRO provisions "are essential to one of REA's central purposes, which is to give enhanced protection to the spouse and dependent children in the event of divorce or separation, and in the event of death, the surviving spouse." *Boggs*, 520 U.S. at 847. Apart from these detailed provisions, ERISA does not confer beneficiary status on nonparticipants by reason of their marital or dependent status. *Id.*

Here, Sandra and Gerald divorced on January 21, 2014, and signed a community property settlement agreement on April 20, 2015 and May 4, 2015. On October 27, 2015, Gerald died in a plane crash. However, a QDRO was filed on January 18, 2017, after Gerald's death.

Pam argues that survivor's annuity benefits vested in her on the date of Gerald's death, and that Sandra's post-death QDRO does not make Sandra a non-spouse beneficiary.

In *Stahl v. Exxon Corp.*, 212 F. Supp. 2d 657 (S.D. Tex. 2002), the court examined whether the ex-wife of a deceased plan participant was entitled to half of the plan proceeds via a QDRO entered after the plan participant died. The *Stahl* court examined a number of similar cases and ultimately concluded that the QDRO at issue was not in place prior to the plan participant's death and, therefore, was without legal effect and was unenforceable. *See e.g, Dorn v. International Broth. of Elec. Workers*, 211 F.3d 938, 948 (5th Cir. 2000); *Rivers v. Central & S.W. Corp.*, 186 F.3d 681, 683 (5th Cir. 1999).

In *Hopkins v. AT & T Global Information Solutions Co.*, a pension plan participant retired and began to draw his pension in the form of a joint and survivor annuity. 105 F.3d 153, 156 (4th Cir. 1997). Sometime later, his former wife obtained a state court order that she should be treated

as the participant's surviving spouse for purposes of the annuity. *Id.* at 155. The Fourth Circuit held that this domestic relations order was not a QDRO because the current wife's right to the survivor's benefits vested upon the participant's retirement and could no longer be alienated. *Id.* at 156–57.

Sandra cites *Yale–New Haven Hospital* and *Files* for the proposition that posthumous orders can be valid QDROs and designate alternate payees as a beneficiary under the Plan. [Doc. No. 36-1, p. 5 (citing *Yale-New Haven Hosp. v. Nicholls*, 788 F.3d 79, 86 (2d Cir. 2015); *Files v. ExxonMobil Pension Plan*, 428 F.3d 478, 487 (3rd Cir. 2005)]. These cases are inapposite. Both cases concerned *nunc pro tunc* orders that related back before the participant's death. There has been no evidence presented that the January 18, 2017 QDRO was a *nunc pro tunc* order. The *Files* court also distinguished *Hopkins*, *supra*, 105 F.3d 153, on the grounds that "in *Hopkins*, there was an attempt to divest benefits already vested in a subsequent spouse, whereas here, there was no such vesting, and therefore, no such disruption to actuarial planning." *Files*, 428 F.3d at 487 n. 12.

Here, Pam is a subsequent spouse who claims that her rights to the benefits had already vested. However, Pam's rights would not have vested at Gerald's death if the property settlement agreement had vested rights in Sandra first.

### 2. Valid QDRO

The community property settlement agreement was filed into the conveyance records of Ouachita Parish on May 22, 2015, and provides that Gerald "shall rollover $500,000.00 from his Fidelity 401K Plan, RMR Mechanical, Inc. into [Sandra]'s Merill Lynch IRA." [Doc. No. 36-2, p. 1]. Therefore, the Court must determine whether Sandra and Gerald's community property agreement itself constituted a valid QDRO for purposes of ERISA.

As stated above, the anti-alienation provision allows retirement benefits to be assigned to an

"alternate payee," such as an ex-spouse, in accordance with a domestic relations order ("DRO") issued by a court. 29 U.S.C. § 1056(d)(3). The statute defines a DRO as follows:

> the term "domestic relations order" means any judgment, decree, or order (including **approval of a property settlement agreement**) which—
>
> (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
>
> (II) is made pursuant to a State domestic relations law (including a community property law).

29 U.S.C. § 1056(d)(3)(B)(ii) (emphasis added). A DRO allows for the alienation of pension benefits only if the plan administrator determines that the DRO is a "qualified domestic relations order" ("QDRO"), which ERISA defines as follows:

> the term "qualified domestic relations order" means a domestic relations order—
>
> (I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and
>
> (II) with respect to which the requirements of subparagraphs (C) and (D) are met.

*Id.* at § 1056(d)(3)(B)(i). Subparagraphs (C) and (D) require that in order to be qualified, a DRO must clearly specify certain information and must not require benefits to be paid in a way that would be inconsistent with the plan or with a previous QDRO:

> (C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—
>
> (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
>
> (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

7

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

(D) A domestic relations order meets the requirements of this subparagraph only if such order—

(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

*Id.* § 1056(d)(3)(C)–(D).

Sandra argues that the property settlement agreement was filed before Gerald's death. If the filed property settlement agreement constitutes a QDRO under ERISA, it would have vested rights in Sandra first. The property settlement agreement appears to satisfy the requirements for a QDRO under ERISA, however the Court has not been provided with "any judgment, decree, or order" approving the settlement. [Doc. No. 20-2]. Therefore, there remains a disputed issue of material fact as to whether the property settlement agreement was approved before Gerald's death.

Construing the allegations in the light most favorable to the non-moving party, Sandra, the Court cannot say as a matter of law that Pam has a right to the funds in the Plan.

### III. CONCLUSION

For the foregoing reasons, Pam's Motion for Judgment on the Pleadings [Doc. No. 32] is DENIED.

MONROE, LOUISIANA, this 10th day of July, 2017.


                                                                                               **ROBERT G. JAMES**
                                                                                               **UNITED STATES DISTRICT JUDGE**