UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| PAM MILETELLO | * | CIVIL ACTION NO. 16-1623 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| RMR MECHANICAL, INC., SANDRA BELLIGARD MILETELLO, and THE SUCCESSION OF GERALD MILETELLO | * | MAG. JUDGE KAREN L. HAYES |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, are cross motions for summary judgment, [docs. # 41 and 45]. Plaintiff, Pam Miletello ("Pam"), filed the first motion for summary judgment, followed by defendant Sandra Bellgard Miletello ("Sandra"). Sandra filed an opposition to Pam's motion for summary judgment [doc #44]. Pam filed an opposition to Sandra's motion [doc #50], Sandra filed a reply [doc. #55], and Pam filed a surreply [doc. #58]. For reasons set forth below, it is recommended that Pam's motion be **DENIED**, that Sandra's motion be **GRANTED**.

## Background

Gerald Miletello ("Gerald") was a principal of defendant RMR Mechanical, Inc. ("RMR") and participant in RMR's 401(k) Plan ("Plan"). [Doc. No. 1]. RMR is the administrator of the Plan. *Id.* On October 26, 2015, Gerald died in a plane crash. [Doc. No. 14-2]. This matter is a dispute between Gerald's ex-wife and widow over entitlement to the funds in Gerald's Plan.

Gerald married Sandra on February 26, 1983. They remained married until January 21, 2014, following the state court's entry of a Judgment of Divorce. [Doc. #46-1, p. 12]. Four months later, Gerald married Pam. [Doc. No. 38].

Gerald and Sandra entered into a community property settlement agreement (the "Settlement Agreement"), which Gerald signed on April 20, 2015, and Sandra signed on May 4, 2015. The Settlement Agreement recognized Sandra's undivided one-half interest in and required Gerald to "rollover $500,000.00 from his Fidelity401K Plan, RMR Mechanical, Inc. into [Sandra]'s Merrill Lynch IRA." [Doc. No. 36-2, p. 1]. On May 23, 2015, the Settlement Agreement was filed into the conveyance records of Ouachita Parish. [Doc. No. 46-1, p. 1]. On September 21, 2015, Sandra filed a Petition for Specific Performance asking the state court to direct Gerald to execute the necessary documents to obtain a court order approving the Settlement Agreement. [Doc. No. 36-2].

On October 28, 2015, the state court entered a Judgment of Partition (the "Judgment of Partition"), which incorporated the terms of the Settlement Agreement. [Doc. #46-1, pp. 8-12]. The Judgment of Partition provides that it "shall be homologated and made a part of the Judgment of Divorce of the parties filed herein on January 21, 2014." *Id.* at 12.

On November 22, 2016, Pam Miletello filed the instant lawsuit pursuant to the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., claiming that she is the surviving spouse of Gerald and the beneficiary of the interest in his Plan. [Doc. No. 1].

On March 13, 2017, the court granted RMR's motion to deposit $500,000 from the Fund into the registry of the court. [Doc. #25]. RMR deposited $518,267.67 into the court registry on April 26, 2017.

On January 18, 2017, the state court entered an order titled Qualified Domestic Relations Order (the "QDRO"). [Doc. No. 14-3]. The QDRO provides that it is "intended to constitute a Qualified Domestic Relations Order under Section 414(p) of the Code and Section 206(d) of

[ERISA]." A copy of the Judgment of Partition was attached to the QDRO. The QDRO provided RMR must segregate $500,000 from the Plan and hold those funds in a separate account for the benefit of Sandra. The QDRO directed RMR to do so "as soon as administratively feasible following the date this Order is approved as a QDRO by [RMR], signed by all parties and the Court, and delivered to [RMR]." [Doc. #14-3, p. 3].

On April 27, 2017, Pam filed a Motion for Judgment on the Pleadings [Doc. #32], which Sandra opposed [Doc. #36]. The parties arguments were similar to their arguments in the instant motions. Pam argued that survivor's annuity benefits vested in her on the date of Gerald's death, and that Sandra's post-death QDRO does not make Sandra a non-spouse beneficiary. On July 10, 2017, the court entered a Ruling [Doc. #39] ("Ruling") denying Pam's Motion for Judgment on the Pleadings [Doc. #32]. The court held that "Pam's rights [to the annuity benefits] would not have vested at Gerald's death if the property settlement agreement had vested rights in Sandra first." *Id.* at 6. However, the court further noted that the settlement agreement was not in the record and found that '[t]here has been no evidence presented that [the QDRO] was a *nunc pro tunc* order." *Id.*

The state court entered an Amended and Restated Qualified Domestic Relations Order ("Amended QDRO") on August 1, 2017, which amended the QDRO by including a provision providing that it "shall have retroactive effect and be a *nunc pro tunc* order with an effective date of May 4, 2015." [doc. #45-5, p. 1]. The Amended QDRO did not contain any other noteworthy amendments.

Pam filed her motion for summary judgment [doc. #41] on July 27, 2017. On August 17, 2017, Sandra filed an opposition to Pam's motion [doc. #44] and a motion for summary judgment [doc. #45]. Pam opposed Sandra's motion [doc. #50], Sandra filed a reply [doc. #55],

3

and Pam filed a surreply [doc. #58]. The motions are now before the court.

I.  **Summary Judgment Standard**

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(a). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id*.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id*.

In evaluating the evidence tendered by the parties, the Court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence

4

of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). There can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23.

When a movant bears the burden of proof on an issue, it must establish "beyond peradventure all of the essential elements of the claim . . . to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). In other words, the movant must affirmatively establish its right to prevail as a matter of law. *Universal Sav. Ass'n v. McConnell*, No. 91-6197, 1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

**II.    ERISA**

ERISA is a federal regulatory scheme that governs employee benefit plans; all benefit plans must conform with ERISA's reporting, disclosure, and fiduciary requirements.[1] *Boggs v. Boggs*, 520 U.S. 833, 841 (1997). Pension plans must also comply with participation, vesting, and funding requirements. *Id.* The Retirement Equity Act of 1984 ("REA"), Pub. L. 98-397, 98 Stat. 1426, amended ERISA in two important ways with respect to surviving spouses. REA first sought to "ensure a stream of income" to surviving spouses by requiring pension plans to provide automatic surviving spouse benefits. *Boggs*, 520 U.S. at 843. Section 1055, as amended by REA, provides that if a vested participant dies before the annuity start date, leaving a surviving spouse to whom he has been married for at least one year, "a qualified preretirement survivor annuity shall be provided to the surviving spouse." 29 U.S.C. § 1055(a)(2).

Generally, ERISA precludes the assignment or alienation of benefits under covered

---

[1] The following discussion of ERISA is largely taken from the curt Ruling [doc. #39] on Pam's motion for judgment on the pleadings [doc. #32].

5

plans, 29 U.S.C. § 1056(d)(1), and preempts state laws that "relate to" employee benefits plans, *id.* § 1144(a). However, ERISA's anti-assignment and -alienation provisions do not apply to, and ERISA does not preempt, "qualified" domestic relations orders. *Id.* §§ 1056(d)(3)(A), 1144(b)(7); *see also Boggs*, 520 U.S. at 846–47. The statute defines a domestic relations order as follows:

> the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which—
>
> > (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
> >
> > (II) is made pursuant to a State domestic relations law (including a community property law).

29 U.S.C. § 1056(d)(3)(B)(ii).

A domestic relations order is "qualified" if it creates or recognizes the existence of an alternate payee's right to "receive all or a portion of the benefits payable with respect to a participant under a plan," (*Id*. at § 1056(d)(3)(B)(i)) and satisfies the following:

> (C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—
>
> > (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
> >
> > (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
> >
> > (iii) the number of payments or period to which such order applies, and
> >
> > (iv) each plan to which such order applies.
>
> (D) A domestic relations order meets the requirements of this subparagraph only if such order—
>
> > (i) does not require a plan to provide any type or form of benefit, or any option,

>not otherwise provided under the plan,
>
>>(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and
>
>>(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

*Id.* § 1056(d)(3)(C)–(D).

If a domestic relations order is "qualified," the designated alternate payee–"any spouse, former spouse, child, or other dependent of a participant"–shall be considered "a beneficiary under the plan." *Id.* at §§ 1056(d)(3)(J)-(K). "Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order." *Id.* at § 1056(d)(3)(A).

In addition, the statute specifically contemplates the assignment of surviving spouse rights to a "former spouse" in a qualified domestic relations order:

>To the extent provided in any qualified domestic relations order--
>>(i) the former spouse of a participant shall be treated as a surviving spouse of such participant for purposes of section 1055 of this title (and any spouse of the participant shall not be treated as a spouse of the participant for such purposes)

*Id.* at § 1056(d)(3)(F)(I).

Together, the surviving spouse and qualified domestic relations order provisions "are essential to one of REA's central purposes, which is to give enhanced protection to the spouse and dependent children in the event of divorce or separation, and in the event of death, the surviving spouse." *Boggs*, 520 U.S. at 847. Apart from these detailed provisions, ERISA does not confer beneficiary status on nonparticipants by reason of their marital or dependent status. *Id.*

### III. The QDRO and Amended QDRO Are Effective Retroactively.

The QDRO and Amended QDRO satisfy the requirements set forth above and are

qualified domestic relations orders under ERISA. The parties do not seriously dispute that conclusion. The issue is whether the QDRO or Amended QDRO were effective prior to Gerald's death and the vesting of Pam's rights to survivor benefits under the Plan. For that, the court must determine the extent and limits of a state court's authority to enter posthumous *nunc pro tunc* qualified domestic relations orders. No Supreme Court or Fifth Circuit precedent is directly on point.

In *Rivers v. Cent. & S. W. Corp.*, the plaintiff sought a qualified domestic relations order awarding her a one-half interest in the survivor benefits payable under her deceased ex-husband's retirement plan. 186 F.3d 681, 682-83 (5th Cir. 1999). The plaintiff asserted that she and the plan participant neglected to include the retirement benefits in their property settlement agreement at the time of their divorce in 1972. *Id.* The same year, the participant married his second wife, to whom he remained married until his death in 1987. *Id.* at 682. The Fifth Circuit held that the survivor benefits irrevocably vested in the participant's second wife at the time of the participant's retirement in 1983. *Id.* at 683-84 (following the Fourth Circuit's reasoning in *Hopkins v. AT & T Global Information Solutions Co.*, 105 F.3d 153, 155-56 (4th Cir. 1997).

The *Rivers* decision does not address the most important issue presently before the court, the validity of *nunc pro tunc* qualified domestic relations orders. In *Yale-New Haven Hosp. v. Nicholls*, 788 F.3d 79, 86 (2d Cir. 2015), the Second Circuit held that The Pension Protection Act of 2006 and the regulations promulgated thereunder make it "clear that the posthumous nature of two *nunc pro tunc* orders does not affect their validity." *Id.* As further support for its holding the Second Circuit reasoned that the *nunc pro tunc* orders were valid qualified domestic relations orders because they were based on a settlement agreement entered before the plan participant's death, which envisioned the entry of the orders. *Id.* Accordingly, the Second Circuit

8

reasoned, the *nunc pro tunc* qualified domestic relations orders effectively assigned benefits to the ex-spouse before the benefits vested in the plan participant's widow. Many other circuit courts addressing the issue have held the same. *See Files v. ExxonMobil Pension Plan,* 428 F.3d 478, 490–91 (3d Cir. 2005), *cert. denied*, 547 U.S. 1160, 126 S. Ct. 2304, 164 L.Ed.2d 834 (2006)*;Hogan v. Raytheon, Co.*, 302 F.3d 854, 857 (8th Cir. 2002); *Patton v. Denver Post Corp.*, 326 F.3d 1148, 1153 (10th Cir. 2003); *Files v. ExxonMobil Pension Plan*, 428 F.3d 478, 487 (3rd Cir. 2005).

The Pension Protection Act of 2006 obliged the Secretary of Labor to issue regulations under ERISA clarifying that:

> a domestic relations order otherwise meeting the requirements to be a qualified domestic relations order ... shall not fail to be treated as a qualified domestic relations order solely because—
> (A) the order is issued after, or revises, another domestic relations order or qualified domestic relations order; or
> (B) of the time at which it is issued [.]

Pub. L. No. 109–280, § 1001, 120 Stat 780 (2006). The Department of Labor later issued regulations fulfilling that requirement and providing that "a domestic relations order shall not fail to be treated as a qualified domestic relations order solely because of the time at which it is issued." 29 C.F.R. § 2530.206(c)(1). Those regulations include an example reiterating that a qualified domestic relations order issued after the death of the plan participant "does not fail to be treated as a qualified domestic relations order solely because it is issued after the death of the Participant." 29 C.F.R. § 2530.206(c)(1), Example (1). Another example clarifies that an "order does not fail to be a qualified domestic relations order solely because it is issued after the annuity starting date" following the plan participant's retirement. 29 C.F.R. § 2530.206(c)(1), Example (3).

9

The undersigned concludes that the court should give retroactive effect to the QDRO and Amended QDRO in accordance with their terms and state law. Under La. Civ. Code, art. 159, "[a] judgment of divorce terminates a community property regime retroactively to the date of filing of the petition. . . ." Here, the petition for divorce between Gerald and Sandra was filed sometime before January 21, 2014, when the state court entered the divorce decree. [Doc. #46-1, p. 12]. At the time the divorce petition was filed, Gerald and Sandra's community property regime dissolved. All that remained was for the community property to be partitioned into divided individual interests. The Settlement Agreement was fully executed by May 4, 2015, and filed on May 23, 2015. The Judgment of Partition, which approved and incorporated the Settlement Agreement, was "homologated and made a part of" the divorce decree entered January 21, 2014. The QDRO incorporated and attached the Judgment of Partition. Accordingly, the QDRO had an effective date no later than May 23, 2015, the date the Settlement Agreement was filed. The Amended QDRO provides for an effective date of May 4, 2015. Whether the Amended QDRO complies with La. C.C.P., art. 1951[2] is of no consequence because effective date of the QDRO preceded Gerald's death. Based on the foregoing, Sandra's right to $500,000 from the Fund vested no later than May 23, 2015. Pam's survivor rights vested upon Gerald's death only in the remainder of the Fund, if any.

## IV.  Sandra's Claim Is Not Time Barred.

Pam argues that 29 U.S.C. § 1056(b)(3)(H) creates an 18-month window deadline for an alternative beneficiary to have an order deemed "qualified" by a court or the plan administrator. Section 1056(b)(3)(H) applies when a plan administrator or court is deciding whether a domestic

---

[2] Article 1951 provides that a court may amend a final judgment "at any time to alter the phraseology of the judgment, but not its substance. . . ."

relations order is "qualified." 29 U.S.C. § 1056(b)(3)(H)(i). It requires that the plan administrator set aside all disputed funds for a period of 18 months, "beginning with the date on which the first payment would be required to be made under the domestic relations order." 29 U.S.C. § 1056(b)(3)(H)(v). If the domestic relations order is found not to be "qualified" or if the 18-month period ends with no determination made, "then the plan administrator shall pay the segregated amounts . . . to the person or persons who would have been entitled to such amounts if there had been no order." 29 U.S.C. § 1056(b)(3)(H)(iii). If a determination is made that the order is a qualified domestic relations order after the end of the 18-month period, it "shall be applied prospectively only." 29 U.S.C. § 1056(b)(3)(H)(iv).

Pam argues that the 18-month period began either when Sandra and Gerald executed the property settlement agreement, April/May 2015, or on October 28, 2015, when the state court signed entered the Judgment of Partition. However, both the QDRO and Amended QDRO provide that payment is to be made "as soon as administratively feasible *following the date this Order is approved as a QDRO by the Plan Administrator*, signed by all parties and the Court, and delivered to the Plan Administrator." [Doc. #44-2, p. 3]. RMR did not approve either the QDRO or the Amended QDRO as qualified domestic relations orders. Instead, RMR submitted the disputed funds into the court registry and deferred to the court's judgment on the issue. Accordingly, "the date on which the first payment would be required to be made under the domestic relations order" has yet to occur. The 18-month period set forth in Section 1056(b)(3)(H)(v) has not lapsed, or even begun.

**IT IS RECOMMENDED** that the motion for summary judgment filed by Sandra [Doc. #45] be **GRANTED** and that judgment entered in her favor.

**IT IS FURTHER RECOMMENDED** that the motion for summary judgment filed by

11

Pam [doc. #41] be **DENIED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 29th day of September, 2017.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE